Slip Op. 17-32

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **COOPER TIRE & RUBBER COMPANY, COOPER (KUNSHAN) TIRE CO., LTD., AND COOPER CHENGSHAN (SHANDONG) TIRE CO., LTD.,** <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES**, <br><br> Defendant, <br><br> and <br><br> **THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,** <br><br> Defendant-Intervenor. | Before: Timothy C. Stanceu, Chief Judge <br><br> Court No. 15-00251 |

**OPINION AND ORDER**

[Remanding for redetermination a cash deposit rate applied to secure estimated antidumping duties]

Dated: March 29, 2017

*Gregory C. Dorris*, Pepper Hamilton LLP, of Washington, D.C., for plaintiffs.

*John J. Todor*, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel was *Mercedes C. Morno*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*Geert De Prest*, Stewart and Stewart, of Washington, D.C., for defendant-intervenor. With him on the brief were *Terence P. Stewart*, *Phillip A. Butler*, and *Nicholas J. Birch*.

Stanceu, Chief Judge: Plaintiffs challenge the antidumping duty cash deposit rate of 11.12% *ad valorem* that the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") applied to imports of passenger car and light truck tires that they produced and exported from the People's Republic of China. For the reasons discussed below, the court sets the cash deposit rate aside as contrary to law.

## I. BACKGROUND

### A. The Parties in this Litigation

Plaintiffs Cooper (Kunshan) Tire Co., Ltd. and Cooper Chengshan (Shandong) Tire Co., Ltd. are affiliated Chinese producers and exporters of tires for passenger cars and light trucks. Plaintiff Cooper Tire & Rubber Company is an affiliated exporter of the subject merchandise of these producers. In this Opinion, the court refers to plaintiffs collectively as "Cooper."

Cooper was a respondent in parallel antidumping duty ("AD") and countervailing duty ("CVD") investigations conducted by Commerce. The petitioner in the investigations was the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW"), which is the defendant-intervenor in this litigation.

### B. The Contested Determination and the Contested Cash Deposit Rate

In June 2015, Commerce issued a decision published as *Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, In Part*, 80 Fed. Reg. 34,893 (Int'l Trade Admin. June 18, 2015) ("*Final AD Determination*"). Commerce subsequently issued an "Amended Final Determination" accompanied by antidumping duty and countervailing duty orders, published as *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Order; and Amended Final*

*Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 80 Fed. Reg. 47,902 (Int'l Trade Admin. Aug. 10, 2015) ("*Amended Final Determination*"). In the Amended Final Determination, Commerce assigned Cooper an estimated dumping margin of 25.84%. *Id.* at 47,905. Commerce nominally set the cash deposit rate at the same rate as the margin but made a downward adjustment resulting in an applied cash deposit rate of 11.12% for the merchandise Cooper exported to the United States. *Amended Final Determination*, 80 Fed. Reg. at 47,904 n.19; *see also Final AD Determination*, 80 Fed. Reg. at 34,897. Cooper claims that the downward adjustment was improperly calculated and is therefore insufficient. Commerce determined a CVD cash deposit rate of 20.73% for Cooper, *Amended Final Determination*, 80 Fed. Reg. at 47,907, which Cooper does not contest in this litigation.

C.  The Parallel AD and CVD Investigations

On July 21, 2014, Commerce initiated the parallel AD and CVD investigations. *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Initiation of Antidumping Duty Investigation*, 79 Fed. Reg. 42,292 (Int'l Trade Admin. July 21, 2014); *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 Fed. Reg. 42,285 (Int'l Trade Admin. July 21, 2014). On January 27, 2015, Commerce published its preliminary less-than-fair value determination in the AD investigation ("Preliminary AD Determination"). *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value; Preliminary Affirmative Determination of Critical Circumstances; In Part and Postponement of Final Determination*, 80 Fed. Reg. 4,250 (Int'l Trade Admin. Jan. 27, 2015) ("*Preliminary AD Determination*").

Commerce initially selected Shandong Yongsheng Rubber Group Co., Ltd. ("Yongsheng") and GITI Tire Global Trading Pte. Ltd. and its affiliates ("GITI") as the only two

mandatory respondents in the AD investigation. *Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Respondent Selection* 4-5 (Int'l Trade Admin. Aug. 27, 2014), ECF No. 33 (Admin.R.Doc. No. 304). Commerce initially chose the same two companies as the mandatory respondents in the parallel CVD investigation. *See* Def.-Int. the USW's Opp'n to Pls.' Mot. for J. on the Agency R., Ex. 1 at 4-5 (Apr. 14, 2016), ECF No. 30 ("USW's Br."). In the Preliminary AD Determination, Commerce stated that Yongsheng "did not demonstrate that it is entitled to a separate rate" and that "[a]ccordingly, we consider Yongsheng to be part of the PRC-Wide Entity." *Preliminary AD Determination*, 80 Fed. Reg. at 4,252. The "PRC-Wide Entity" includes the Chinese exporters and producers Commerce determines not to have demonstrated independence from the government of the PRC.

Prior to publication of the Preliminary AD Determination, Commerce selected Sailun Group Co., Ltd. ("Sailun") to replace Yongsheng as the second mandatory respondent in the AD investigation. *See Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Selection of Additional Mandatory Respondent* (Int'l Trade Admin. Oct. 7, 2014), ECF. No. 33 (Admin.R.Doc. No. 617). Because Commerce decided not to select Cooper as a mandatory respondent, and because it rejected Cooper's request to be named a voluntary respondent, in the AD investigation (decisions Cooper does not challenge in this litigation), Cooper did not receive an individual weighted average margin in the AD investigation. Instead, Cooper was assigned the rate assigned to all "separate rate" respondents in that investigation, i.e., respondents that qualified for a rate separate from the rate Commerce applied to the PRC-Wide Entity. Commerce, however, chose Cooper as the second mandatory respondent in the CVD investigation. USW's Br., Ex. 2 at 2. GITI remained as a mandatory respondent in both investigations.

On June 18, 2015, Commerce published the final determination in the antidumping duty investigation, *Final AD Determination*, 80 Fed. Reg. at 34,893, which Commerce amended on August 10, 2015 for correction of ministerial errors, *Amended Final Determination*, 80 Fed. Reg. at 47,902. The final individual weighted average dumping margins in the Amended Final Determination were 30.74% for GITI and 14.35% for Sailun; Commerce assigned a rate of 25.84% to the separate rate respondents in the antidumping duty investigation, including Cooper, calculated as the weighted average of the two individual margins. *Amended Final Determination*, 80 Fed. Reg. at 47,905.

In the Final AD Determination, Commerce announced that the cash deposit rate for merchandise produced or exported by Cooper would be calculated by making two downward adjustments to Cooper's nominal cash deposit rate, which was the same as the final dumping margin (determined at that time as 25.30%, which Commerce applied to Cooper and all other separate rate respondents). *Final AD Determination*, 80 Fed. Reg. at 34,897. For the first adjustment to the cash deposit rate, Commerce stated that it would subtract from the percentage the "export subsidy rate" of 11.13%, which Commerce determined individually for Cooper in the course of the companion countervailing duty investigation. *Id*. The other separate rate respondents in the AD investigation received an "all-others" export subsidy downward adjustment of 13.53% to their cash deposit rate. *Id.*

For the second adjustment, Commerce announced that it would make a further reduction in the cash deposit rate for Cooper, as well as for the other separate rate respondents, of 3.59% "to account for estimated domestic subsidy pass-through." *Id.* (footnote omitted). As applied to Cooper's amended final dumping margin and nominal cash deposit rate of 25.84% as determined in the Amended Final Results, the two downward adjustments resulted in the applied AD cash

deposit rate of 11.12% that Cooper contests in this action.  *See Amended Final Determination*, 80 Fed. Reg. at 47,904 n.19.

### D. Cooper's Initiation of this Action and the USW's Intervention as of Right

On September 8, 2015, Cooper filed its summons, Summons, ECF No. 1; Cooper filed its complaint on October 7, 2015, Compl., ECF No. 9.  On January 15, 2016, Cooper moved for judgment on the agency record pursuant to USCIT R. 56.2.  *See* Rule 56.2 Mot. for J. on the Agency R. of Pls. Cooper Tire & Rubber Company, Cooper (Kunshan) Tire Co., Ltd., and Cooper Chengshan (Shandong) Tire Co., Ltd. and Mem. in Supp. (Jan. 15, 2016), ECF No. 22 ("Cooper's Br.").  This motion, opposed by defendant United States, is now before the court.  Def.'s Resp. to Pls.' Rule 56.2 Mot. for J. upon the Agency R. (Apr. 14, 2016), ECF No. 31 ("Def.'s Br.").

On November 10, 2015, the court granted the USW's motion to intervene as of right in this action as defendant-intervenor.  Order (Nov. 10, 2015), ECF No. 15.  The USW also opposes Cooper's Rule 56.2 motion.  *See* USW's Br.

The court held oral argument on Cooper's Rule 56.2 motion on September 22, 2016.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Court Act of 1980, 28 U.S.C. § 1581(c).  In reviewing a determination in an antidumping duty investigation, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).

B.  The Statutory Framework

Section 735(c)(1)(B)(i) of the Tariff Act of 1930 as amended ("Tariff Act") provides that Commerce, upon reaching a final affirmative less-than-fair-value determination in an antidumping duty investigation, shall "determine the estimated weighted average dumping margin for each exporter and producer individually investigated," 19 U.S.C. § 1673d(c)(1)(B)(i)(I), and "determine . . . the estimated all-others rate for all exporters and producers not individually investigated," id. § 1673d(c)(1)(B)(i)(II).[1]

Commerce determines a "dumping margin" according to "the amount by which the normal value[2] exceeds the export price or constructed export price of the subject merchandise."[3]  19 U.S.C. § 1677(35)(A).  A "weighted average dumping margin" is calculated

---

[1] Citations herein to the United States Code are to the 2012 edition.  Citations to the Code of Federal Regulations are to the 2015 edition.

[2] Although usually determined from the price at which a product identical or similar to the subject merchandise is sold or offered for sale in the home market of the exporting country, see 19 U.S.C. §§ 1677(16), 1677b(a), the normal value of subject merchandise exported from a country, such as China, that Commerce considers to be a nonmarket economy country is determined according to specialized procedures.  Under these procedures, Commerce typically determines normal value "on the basis of the value of the factors of production utilized in producing the merchandise," adding amounts for expenses and profit.  Id. § 1677b(c)(1).  The "factors of production" include labor hours and the quantities of materials used in production.  Id. § 1677b(c)(3).

[3] "Export price" is an adjusted price determined from the "price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States . . . ." 19 U.S.C. § 1677a(a).  "Constructed export price" is an adjusted price determined from the "price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter . . . ."  Id. § 1677a(b).

as "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." *Id.* § 1677(35)(B).

### 1. Estimated Weighted Average Dumping Margins

The statute describes, in 19 U.S.C. § 1673d(c)(1)(B)(i)(I), the individual weighted average dumping margin and, in § 1673d(c)(1)(B)(i)(II), the all-others rate as "estimated," consistent with the retrospective statutory scheme for assessment of antidumping duties, under which Commerce, at a later time, determines the amount of antidumping duty that actually is to be assessed and collected upon the liquidation of entries of subject merchandise. *See* 19 C.F.R. § 351.212 ("[T]he United States uses a 'retrospective' assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported.").

### 2. The Cash Deposit Requirement

Further to the retrospective statutory scheme, the Tariff Act provides for security for the future collection of antidumping duties. Commerce "shall order the posting of a cash deposit, bond, or other security," as Commerce "deems appropriate, for each entry of the subject merchandise . . . ." 19 U.S.C. § 1673d(c)(1)(B)(ii). The statute directs that the cash deposit or other security be "in an amount based on the estimated weighted average dumping margin or the estimated all-others rate, whichever is applicable."[4] *Id*. Although generally allowing the posting of bonds as security for "provisional measures," i.e., antidumping duty deposits on importations

---

[4] Under a parallel countervailing duty provision in the Tariff Act, Commerce is to order security for potential countervailing duty liability upon reaching a final affirmative determination that a countervailable subsidy is being provided. 19 U.S.C. § 1671d(c)(1)(B)(ii).

of merchandise subject to an AD investigation made prior to the issuance of an antidumping duty order, the Department's regulations provide that "[g]enerally, upon the issuance of an order, importers no longer may post bonds as security for antidumping or countervailing duties, but instead must make a cash deposit of estimated duties." 19 C.F.R. § 351.211(a).

### 3.  The "Export Subsidy" and "Domestic Subsidy Pass-Through" Provisions

The "export subsidy" provision of section 772 of the Tariff Act, 19 U.S.C. § 1677a(c)(1)(C), directs Commerce to increase the "[t]he price used to establish export price and constructed export price" (the "starting price")[5] by "the amount of any countervailable duty imposed on the subject merchandise under part 1 of this subtitle to offset an export subsidy."[6] 19 U.S.C. § 1677a(c)(1)(C).  In determining the estimated weighted average dumping margins of the two mandatory respondents, Commerce did not make upward adjustments to the starting prices for any countervailable duty imposed to offset an export subsidy.  As a result, the all-others rate of 25.84% that Commerce applied to Cooper and the other separate rate respondents, which was derived from the individually determined margins, does not reflect an adjustment made under § 1677a(c)(1)(C).  During the investigation, Commerce explained that "[u]nlike in administrative reviews, the Department calculates the adjustment for export subsidies in investigations not in the margin-calculation program, but in the cash-deposit instructions issued

---

[5] Commerce refers to the price used to establish export price or constructed export price, prior to upward and downward adjustments, as the "starting price." 19 C.F.R. § 351.402(a).

[6] The reference to "part 1 of this subtitle" is a reference to "Part I—Imposition of Countervailing Duties" and to "Subtitle IV—Countervailing and Antidumping Duties" of the Tariff Act of 1930.

to [U.S. Customs and Border Protection ("CBP")]." *Final AD Determination*, 80 Fed. Reg. at 34,897 n.12.

The "domestic subsidy pass-through" provision of section 777A(f) of the Tariff Act, 19 U.S.C. § 1677f-1(f), applies only to imported merchandise (1) that is from a nonmarket economy country and (2) for which Commerce determines normal value according to the method of 19 U.S.C. § 1677b(c), both of which conditions applied in the instant investigation. Described in general terms, this provision applies if Commerce determines that a countervailable subsidy (other than an export subsidy referred to in 19 U.S.C. § 1677a(c)(1)(C)) has been provided that reduced the average price of the subject imports and increased the weighted average dumping margin. 19 U.S.C. § 1677f-1(f). In that event, Commerce is directed to reduce the antidumping duty by the amount of the increase in the dumping margin that Commerce can reasonably estimate. *Id.*

## C.  Summary of Plaintiffs' Claims

Cooper's principal claim is that Commerce should not have based the downward adjustment for 19 U.S.C. § 1677a(c)(1)(C), i.e., the export subsidy adjustment, on information specific to Cooper that was on the record of the parallel countervailing duty investigation. Cooper claims that Commerce erred in not allowing Cooper the benefit of a 13.53% downward export subsidy adjustment, which was the adjustment Commerce allowed for all other separate rate respondents in the AD investigation. Cooper points out that "even though Cooper is an AD separate rate respondent like the 62 other separate rate respondents, the AD cash deposit rate for Cooper is 11.12% *ad valorem* and that of all the other 62 separate rate respondents is 8.72% *ad valorem*." Cooper's Br. 7 (citation omitted). According to Cooper, Commerce, lacking a rational basis to treat Cooper differently than it treated the other separate rate respondents, acted arbitrarily and capriciously in limiting the export subsidy deduction to 11.13%. Cooper submits

that Commerce should have applied to its subject merchandise a cash deposit requirement calculated as 8.72%, i.e., 25.84% (the all-others AD rate and nominal cash deposit) adjusted downward by 13.53% (the export subsidy adjustment applied to the cash deposit rate for the other separate rate respondents in the AD investigation) and by 3.59% (the domestic pass-through subsidy adjustment applied to the cash deposit rate for those other separate rate respondents).

Cooper's second claim is in the alternative and is conditioned on the court's deciding, contrary to Cooper's first claim, that Commerce had a rational basis to treat Cooper differently than other AD separate rate respondents. If the court were to so decide, Cooper's claim would be that Commerce erred in making a downward adjustment of only 3.59% to account for domestic "pass-through" subsidies pursuant to 19 U.S.C. § 1677f-1(f). Cooper argues that Commerce should be directed to use the record evidence from the CVD investigation pertaining to Cooper, under which, Cooper submits, the domestic subsidy adjustment to the cash deposit rate would be 8.68%, not 3.59%. Cooper maintains that if Commerce uses 11.13% as the export subsidy adjustment, which is based on Cooper's own data, then as a matter of consistency it also must use Cooper's actual domestic pass-through adjustment. Cooper's Br. 19. This would result in a cash deposit rate of 6.03% for Cooper, calculated by subtracting 11.13% and 8.68% from 25.84%.

Cooper's claims are confined to the 11.12% adjusted cash deposit rate. Cooper does not challenge the calculation of the estimated all-others rate of 25.84% that Commerce applied to it. Nor does Cooper claim that Commerce acted unlawfully in effectuating 19 U.S.C. § 1677a(c)(1)(C) by making a downward adjustment to its nominal cash deposit rate of 25.84% rather than by adjusting the export price ("EP") or constructed export price ("CEP") of the mandatory respondents.

Cooper makes no claim that Commerce acted contrary to law in implementing 19 U.S.C. § 1677f-1(f) by means of a downward adjustment to its nominal cash deposit rate.

<u>D.  Adjudication of Cooper's Primary Claim</u>

In summary, Cooper's argument is that Commerce, lacking a rational basis to treat Cooper differently than it treated the other separate rate respondents, acted arbitrarily and capriciously in making the 11.13% export subsidy adjustment. Cooper's Br. 14-15. The Department's methodology, in Cooper's view, was applied with no valid explanation, was designed to apply only to respondents in Cooper's specific situation (a separate rate respondent in the AD investigation and a mandatory respondent in the CVD investigation), and "ensures that such respondents will receive a cash deposit rate that most likely is higher than (or at best the same as) the other separate rate respondents." Cooper's Br. 14. Arguing that Commerce chose to offset the cash deposit rate by the lower of the rate specific to Cooper or that of the separate rate respondents, Cooper comments that its "actual data will only be used to make it suffer." *Id*. at 16.

Under 19 U.S.C. § 1516a(b)(1)(B)(i), the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." This standard of review has been recognized to encompass the "arbitrary and capricious" standard established under the Administrative Procedure Act ("APA"). *Changzhou Wujin Fine Chemical Factory Co.*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)). "[A]n agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." *RHP Bearings Ltd. v. United States,* 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States,* 91 F.3d 232, 237 (D.C. Cir. 1996)). For an agency action to be upheld, it must "offer some rationale that could explain the

maintenance of different standards for similarly situated claimants, or it must explain why such claimants are in fact not similarly situated." *Serv. Women's Action Network v. Sec'y of Veterans Affairs*, 815 F.3d 1369, 1380 (Fed. Cir. 2016).

The uncontested record facts pertaining to the cash deposits did not provide Commerce a rational basis upon which to treat Cooper differently than the other separate rate respondents. While Commerce had a *basis* for treating Cooper differently, it was not a *rational* basis because it relied upon a method of determining an estimated antidumping duty rate that was unrelated to Cooper's future antidumping duty liability. The basis for the different treatment was the Department's selection of Cooper as a mandatory respondent in the parallel countervailing duty investigation. That provided Commerce with data from which it could calculate, at 11.13%, a percentage for the export subsidy adjustment that was individual to Cooper. Commerce could not do so for the merchandise of the other AD separate rate respondents, who were not mandatory respondents in the CVD investigation. Commerce reasoned that "for the final CVD determination, the Department has determined that Cooper has received export subsidies" that "are countervailed at a lower rate than the weighted-average export subsidy rate applied to the AD mandatory respondents, upon which Cooper's antidumping duty is based." *Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, A-570-016, at 21 (Int'l Trade Admin. June 11, 2015) (footnote omitted), *available at* http://enforcement.trade.gov/frn/summary/prc/2015-15058-1.pdf (last visited Mar. 21, 2017). The "weighted-average export subsidy rate applied to the AD mandatory respondents" was 13.53%, which Commerce used to adjust the cash deposit rates of the separate rate respondents in the AD investigation other than Cooper. Commerce also concluded that "[a]lthough Cooper's dumping margin is based on the rates for the mandatory respondents in the AD investigation, there is no

double remedy applied to Cooper once its AD rate is adjusted for its calculated export subsidy rate." *Id.*

As the Tariff Act provides in 19 U.S.C. § 1673d(c)(1)(B)(ii) and related provisions, the cash deposit or other security for merchandise exported or produced by any respondent, including a respondent not individually investigated, is to be based on an estimate of the antidumping duty that in the future will be imposed on that merchandise. Therefore, there could have been a rational basis for treating Cooper differently than the other separate rate respondents in the AD investigation only if the difference in Cooper's treatment as to the export subsidy adjustment were rationally related to estimated future antidumping duties. Under the Department's method of calculating the cash deposits, it was not.

The statute provides separately for "individually investigated" exporters and producers, 19 U.S.C. § 1673d(c)(1)(B)(i)(I), and for "all exporters and producers not individually investigated," *id.* § 1673d(c)(1)(B)(i)(II). Upon a final affirmative less-than-fair-value determination, each of the former receives an individual "estimated weighted average dumping margin." *Id.* § 1673d(c)(1)(B)(i)(I). The latter receive an "estimated all-others rate." *Id.* § 1673d(c)(1)(B)(i)(II). The statute draws the same basic distinction with respect to the cash deposit or other security.

Commerce sets the cash deposit rate as "security" for the potential antidumping duty liability according to its authority under 19 U.S.C. § 1673d(c)(1)(B)(ii), under which Commerce "shall order the posting of a cash deposit, bond, or other security, as [Commerce] deems appropriate, for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin or the estimated all-others rate, *whichever is applicable*." *Id.* § 1673d(c)(1)(B)(ii) (emphasis added). Thus, the statutory scheme distinguishes between individually investigated respondents and all other respondents, both as to the type of weighted

average dumping margin each type receives and as to the security for future antidumping duty liability that Commerce is to order.  In contrast to the "estimated" rate, which is an estimate of the potential antidumping duty liability, the actual antidumping duty ordinarily is determined upon completion of an administrative review of the order; an exception occurs where, for example, no review of a respondent has been completed, in which event the cash deposit rate becomes the assessment rate.[7]  *See* 19 C.F.R. § 351.212.

If reviewed, Cooper may receive an individual weighted average dumping margin in the first administrative review if Commerce chooses it for individual examination.  *See* 19 U.S.C. § 1677f-1(c).  Because such a margin must be individual to Cooper, it will not depend on, and it will not be related to, the margin or margins Commerce assigns in the review to respondents who are reviewed but not individually examined.  Instead, Commerce will calculate the export price (or constructed export price) of Cooper's subject merchandise according to Cooper's own data.  The individual calculation of EP or CEP will include an individual adjustment made for any countervailable export subsidy imposed.  *See* 19 U.S.C. § 1677a(c)(1)(C) (increasing the starting price for EP or CEP by "the amount of any countervailing duty imposed *on the subject merchandise . . .* to offset an export subsidy" (emphasis added)).  In other words, if Cooper is

---

[7] In a notice published subsequent to this action (of which the court takes judicial notice), Commerce announced that a request for review of Cooper was received for the first administrative review of the AD order. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 71,061 (Int'l Trade Admin. Oct. 14, 2016).  If reviewed, Cooper either will be an individually examined respondent in the first review or will be reviewed but not individually examined.  *See* 19 U.S.C. § 1677f-1(c).  In the unlikely event that all requests for review of Cooper are effectively withdrawn, entries of Cooper's merchandise will be assessed antidumping duties at "the cash deposit rate applicable at the time merchandise was entered." 19 C.F.R. § 351.212(a).  It is possible to interpret this regulation to mean that the assessment rate would be the adjusted cash deposit rate (in which case Cooper would be treated differently than any other separate rate respondent in the AD investigation for which no review was requested), but the regulations are not clear on the point.

individually examined in the first review, Cooper will not receive a dumping margin determined by a method parallel to the "hybrid" method Commerce used to calculate its adjusted cash deposit in the AD investigation, which combines an all-others antidumping duty margin and an individually-determined export subsidy adjustment. Notably, the statute ties the export subsidy adjustment to the specific export prices or constructed export prices of a respondent that is individually investigated (in an investigation) or that is individually examined (in a review), not to the margin of an uninvestigated or non-individually-examined respondent or to the U.S. prices at which such a respondent's subject merchandise is sold.

Nor will Cooper receive a dumping margin determined by a method parallel to the Department's hybrid method of calculating the adjusted cash deposit if Cooper is reviewed but *not* selected for individual examination in the administrative review. In that event, Commerce will be required to apply any adjustment for export subsidies in calculating EP or CEP, and therefore in calculating the individual weighted average margins, for the individually examined respondents. *See* 19 U.S.C. § 1677a(c)(1)(C). In the investigation, Commerce has indicated that in an AD review, it makes the export subsidy adjustment "in the margin-calculation program." *Final AD Determination*, 80 Fed. Reg. at 34,897 n.12 ("*Unlike in administrative reviews*, the Department calculates the adjustment for export subsidies in investigations not in the margin-calculation program, but in the cash-deposit instructions issued to CBP." (emphasis added)). Based on the statutory scheme, and consistent with the procedure the Department announced, a margin for a reviewed respondent that is not individually examined in the first administrative review will not be affected by its own individual export subsidy adjustment in that review.

In conclusion, the cash deposit rate Commerce applied to Cooper's merchandise in the antidumping duty investigation is designated by statute as an estimate of the future antidumping duty liability. In this instance, however, Commerce determined the contested cash deposit rate

according to a method unrelated to the future antidumping duties that will be owed on that merchandise.  That the estimate might turn out to be a reasonable estimate of future AD liability in a numerical sense is not sufficient to save the decision where, as here, the method by which the estimate was derived cannot be justified under the relevant statutory provisions.  In subjecting Cooper's merchandise to a cash deposit that varied from the cash deposit applied to all other separate rate respondents in the antidumping duty investigation, Commerce acted arbitrarily and capriciously and, therefore, impermissibly.

Because the court finds merit in Cooper's primary claim, the court does not consider the claim Cooper makes in the alternative.

Defendant takes the position that Commerce acted permissibly in making the 11.13% export subsidy adjustment to the cash deposit rate, arguing that "Commerce reasonably looked to the actual export subsidy rate that would be assessed on Cooper's subject merchandise and applied that amount for Cooper's export subsidy adjustment." Def.'s Br. 21.  According to defendant, "Commerce's actions were consistent with the statute and moreover, ensured that the export subsidy adjustment credited Cooper for the export subsidy rate that will be applied to it." *Id.*  This argument fails to confront the problem the court has identified.  As the court has explained, the export subsidy adjustment that will be made in the first periodic administrative review will be specific to the export prices or constructed export prices of an individually examined respondent, and if Cooper is individually examined, any adjustment will be made to its own EP or CEP starting prices.  If not, any adjustment Cooper receives will be that of the mandatory respondents.  Because the "hybrid" method Commerce employed as a means of estimating future AD duty liability has no basis in the statute, Commerce acted arbitrarily and capriciously in treating Cooper differently from the other separate rate respondents in the investigation.  Therefore, defendant is not correct in arguing that the adjustment Commerce

made "ensured that the export subsidy adjustment credited Cooper for the export subsidy rate that will be applied to it." *Id*.

Defendant-intervenor's argument is also unpersuasive. The USW argues that the export subsidy adjustment is mandated by the statute, requiring no additional demonstration in the AD investigation and reflecting the presumption that export subsidies directly contribute to the lowering of import prices. USW's Br. 10. The USW points out that "[w]hen there is not yet a countervailing duty order, the agency performs the adjustment for export subsidies by reducing the antidumping deposit rate by the CVD deposit rate attributable to the export subsidy as found in the parallel CVD investigation." *Id.* at 11. Cooper, however, does not contest the Department's practice of making the export subsidy adjustment to the cash deposit rate rather than in a margin analysis when it is conducting the AD investigation. The USW's argument does not provide a convincing reason why Commerce did not act arbitrarily and capriciously in treating Cooper differently than other separate rate respondents in the investigation, and it does not address the problem posed by the Department's using a method of estimating future AD liability that does not accord with what will occur in the subsequent administrative review.

### E.  Remedy Sought by Cooper

On its primary claim, Cooper argues that "[t]he Court should order the Department on remand to determine Cooper's AD cash deposit rate the same as all other separate rate respondents." Cooper's Br. 19. Because it was arbitrary and capricious for Commerce to assign to Cooper's subject merchandise an adjusted cash deposit rate that differed from the cash deposit rate assigned to the subject merchandise of the other separate rate respondents, the court agrees that Cooper is entitled to this remedy. To date, Cooper has not sought injunctive or other equitable relief as to the implementation of the remedy it is pursuing.

Because this matter is time sensitive, the court is ordering that Commerce expedite its issuance of its decision upon remand (the "Remand Redetermination"). For the same reason, the court is ordering the parties to address in their comment submissions the issue of when the remedy will be effectuated in instructions issued to U.S. Customs and Border Protection.

### III. CONCLUSION

For the reasons stated in the foregoing, the court concludes that the Department's method of determining Cooper's cash deposit rate was arbitrary and capricious and, accordingly, that the determination of the cash deposit rate must be set aside as unlawful.

Therefore, upon consideration of the contested decision and all papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that Commerce, within fifteen days of the issuance of this Opinion and Order, shall issue a redetermination upon remand ("Remand Redetermination") in which it redetermines in accordance with this Opinion and Order the contested cash deposit rate and informs the court of the date by which it will place the redetermined cash deposit rate into effect by means of instructions issued to U.S. Customs and Border Protection; it is further

**ORDERED** that plaintiffs and defendant-intervenor may submit comments on the Remand Redetermination within ten days of the filing of the Remand Redetermination; it is further

**ORDERED** that in their comment submissions the parties address the issue of when the remedy ordered by the court should be effectuated in instructions issued to U.S. Customs and Border Protection; and it is further

**ORDERED** that defendant may respond to plaintiffs' comments within ten days of the filing of such comments.

                                                   /s/ Timothy C. Stanceu
                                                   Timothy C. Stanceu
                                                   Chief Judge

Dated:  March 29, 2017
          New York, New York